## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

GABRIEL SCHLOUGH,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
CHIEF OF POLICE PAUL PAZEN, in his individual capacity,
COMMANDER PATRICK PHELAN, in his individual capacity,
LIEUTENANT VINCE PORTER, in his individual capacity,
LIEUTENANT J.D. WILLIAMS, in his individual capacity,
ZACKARY PETRICK, in his individual capacity,
JULIE WEINHEIMER, in her individual capacity,

     Defendants.

_____

## COMPLAINT AND JURY DEMAND
_____

Plaintiff Gabriel Schlough, by and through his attorney Andy McNulty of KILLMER, LANE & NEWMAN, LLP, respectfully alleges for his Complaint and Jury Demand as follows:

### INTRODUCTION

1.     On May 31, 2020, Gabriel Schlough was peacefully serving as a protest medic at the protests that erupted in Denver since the video of brutal police murder of George Floyd had been released publicly. Mr. Schlough attended the protest on May 31st with the intention of expressing his opposition to racial injustice and police brutality as well as helping anyone who was injured by Denver Police Department ("DPD") officers. Instead of helping others who were injured by unprecedented police brutality, Mr. Schlough became a victim himself. An officer shot him in the face with a Kinetic Impact Projectile ("KIP"), severing his chin and causing irreparable harm.

2.     Throughout the George Floyd protests, DPD officers, and officers from agencies throughout the region who responded and operated under DPD's command, purposefully shot at peaceful protesters. They whooped while doing so. They celebrated when protesters were injured. And, they did all of this with one goal: to discourage people from exercising their First Amendment rights. The joy that DPD officers felt while retaliating against peaceful protesters reaffirmed the underlying principle of the protests.

3.     The City and County of Denver ("Denver"), and the agencies it called upon to police the protests, have thus far refused to reckon with the systemic violence its officers perpetrated on peaceful protesters. Mr. Schlough files this lawsuit to hold accountable the officers who were routinely brutalizing their own citizens.

## PARTIES

4.     At all times pertinent to the subject matter of this litigation, Plaintiff Gabriel Schlough was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

5.     Defendant Denver is a Colorado municipal corporation.

6.     At all times pertinent to the subject matter of this litigation, Defendant Paul Pazen was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Pazen was acting under color of state law in her capacity as Chief of Police of Denver. Defendant Pazen was responsible for supervising Defendants John Doe and directing her or his actions during the protests in response to the murder of George Floyd and, specifically, her or his actions during the protest on May 31, 2020.

7.     At all times pertinent to the subject matter of this litigation, Defendant Patrick Phelan was a citizen of the United States and resident of and domiciled in Colorado. At all times

pertinent, Defendant Phelan was acting under color of state law in his capacity as a Commander in the DPD and, specifically, as the Incident Commander for the George Floyd protests in Denver. Defendant Phelan was responsible for supervising Defendant John Doe and directing her or his actions during the protests in response to the murder of George Floyd and, specifically, her or his actions during the protest on May 31, 2020. Commander Phelan authorized the use of KIPs on protesters throughout the George Floyd protests and specifically the use of KIPs against Plaintiffs on May 31, 2020.

8.      At all times pertinent to the subject matter of this litigation, Defendant Vince Porter was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Porter was acting under color of state law in his capacity as a Lieutenant in the DPD and, specifically, as the lieutenant in charge of the designated area #3, which consisted of the Broadway and Lincoln corridor, from 14th Avenue to 8th Avenue. Defendant Porter was supervising the officers who shot Mr. Schlough on May 31, 2020.

9.      At all times pertinent to the subject matter of this litigation, Defendant J.D. Williams was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Williams was acting under color of state law in his capacity as a Lieutenant in the DPD and, specifically, as the lieutenant in charge of the designated area #1, which consisted of Civic Center Park and Veteran's Park. Defendant Williams was specifically dispatched to supervise officers in the area where Mr. Schlough was shot on May 31, 2020 and, upon information and belief, was supervising the officers who shot Mr. Schlough on May 31, 2020.

10.     At all times pertinent to the subject matter of this litigation, Defendant Zackary Petrick was a citizen of the United States and resident of and domiciled in Colorado. At all times

pertinent, Defendant Petrick was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the DPD.

11.     At all times pertinent to the subject matter of this litigation, Defendant Julie Weinheimer was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Weinheimer was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer employed by the DPD

## JURISDICTION AND VENUE

12.     This action arises under the Constitution and laws of the United States, and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

13.     Venue is proper in this District according to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in this District and all Defendants reside in this District.

## FACTUAL ALLEGATIONS

### George Floyd's murder caused an uprising against racist policing.

14.     George Floyd was murdered on May 25, 2020.

15.     Minneapolis police officers arrested Mr. Floyd, a 46-year-old Black man, after a convenience store employee called 911 and told the police that Mr. Floyd had bought cigarettes with a counterfeit twenty-dollar bill. Those officers pinned Mr. Floyd to the ground. Then one officer, Derek Chauvin, put his knee on Mr. Floyd's neck. He would choke Mr. Floyd for eight minutes and forty-six seconds while Mr. Floyd repeatedly told him that he couldn't breathe; while numerous other officers callously looked on and did absolutely nothing; while bystanders

4

pleaded for Officer Chauvin to stop killing Mr. Floyd; while Officer Chauvin mocked Mr. Floyd. Among Mr. Floyd's final words were "please, please, please, I can't breathe." He would die in the street under the knee of the oppressor.

16.     Mr. Floyd's death was emblematic of the diseased, racist system of policing in the United States of America. Officers know that they can violate the law, and constitution, with impunity, and particularly when the victim of their abuse is a person of color. Fellow officers will do nothing more than stand by and watch. And, when someone complains, the police department, police union, and local prosecutors and politicians will circle the wagons in defense of a murderer, simply because he wears a badge and a gun.

17.     Mr. Floyd's murder, and this system, sparked millions of people to gather across this nation, and world, to mourn and call for the abolition of modern policing.

18.     Denver was among the cities where there was a strong reaction to Mr. Floyd's death with thousands taking to the streets in protest.

19.     Mr. Floyd's murder hit home for Denverites because of Denver law enforcement's repeated murder and brutalization of people of color without consequence, and its history of racist policing. In Denver, there has been George Floyd after George Floyd. From Marvin Booker to Michael Marshall, Denver law enforcement officers have murdered with near impunity. The officers who murdered these Black men still patrol the streets and jails of Denver.

20.     Denver's racist policing is borne out by statistics. Denver law enforcement officers disproportionately use force against Black people. While only 10% of Denver's population is Black, 27% of the use of force incidents in Denver are perpetrated against Black people.

21.     Protesters in Denver held signs, and chanted names, relating to this long, sordid history of law enforcement brutality against Black men. Protesters called for an end to the racist policing that Denver has condoned for decades. Those at the protests voiced their disgust with Denver's lawless law enforcement officers.

22.     From the beginning, the protests against police brutality in Denver were met with the very thing they were protesting. Despite the repressive tactics of Denver police officers on the first day of the protests, May 28, 2020, Denver's citizens continued to take to the streets to call for justice and a dramatic restructuring of how policing operates.

23.     In response, Denver invoked Colorado's Mutual Aid Statute, calling for other agencies from across the metro area to respond and assist with brutalizing protesters.

**Plaintiff Gabriel Schlough takes to the streets in memory of George Floyd and to assist those injured by the routine police brutality that had been visited upon peaceful protesters.**

24.     During the first few days of the George Floyd protests in Denver, Gabriel Schlough watched coverage in the media, and videos posted on social media, of DPD officers brutalizing peaceful protesters and unleashing routine and excessive force on those gathered to mourn George Floyd's life and protest police brutality and racism. Ms. Schlough had seen this oppression by police forces before. He had worked in public health in West Africa. The DPD response reminded him of oppressive regimes crackdown of peaceful protest in those countries. That these actions were occurring in America appalled Mr. Schlough, but did not shock him. Because of his experience in public health, and his experience with protests in West African nations, Mr. Schlough decided to attend the protests and help those who suffered injuries at the hands of the police.

25.     On May 31, 2020, Gabriel Schlough was peacefully serving as a protest medic at the protests. Mr. Schlough attended the protest on May 31, 2020 with the intention of expressing his opposition to racial injustice and police brutality as well as helping anyone who was injured by DPD officers. Mr. Schlough was ready to use his considerable skills to aid protesters. He has a degree in public health anthropology as well as some medical training, and he had participated in protests before as a medic. Mr. Schlough is experienced in harm reduction.

26.     When Mr. Schlough arrived at the protest around 9:00pm, he saw a crowd of two or three hundred people in front of a line of police officers near 14th Street and Broadway. The officers were standing just a little bit more than shoulder to shoulder apart in full riot gear with their face shields on.

27.     Mr. Schlough, sensing a conflict, moved up toward the front of the crowd and began to tell people who didn't have eye coverings to watch their eyes and protect their face. The police line began to advance, and Mr. Schlough started trying to pull people out of the way of the police.

28.     Then, without warning, DPD officers shot a woman in the chest with a tear gas canister right next to Mr. Schlough. Mr. Schlough bent down to help the woman and, while doing so, covered the tear gas canister with a cone to protect the woman who had fallen to the ground in pain.

29.     As soon as Mr. Schlough went to help the woman who had been shot, Defendants Petrick and Weinheimer shot Mr. Schlough in the face and chest with KIPs from about ten to fifteen feet away, again without warning. There was no one else in the immediate vicinity that Defendants Petrick and Weinheimer could have been aiming at. Mr. Schlough described the sensation as getting hit with a baseball bat.

30.     When Mr. Schlough was shot, he was not engaging in any violence or threatening

anyone with any violence. He had not committed any crime. Mr. Schlough had not destroyed any

property or threatened to destroy any property. Mr. Schlough was completely peaceful and did

not have any intention of engaging in anything that could be considered criminal, violent, or

otherwise unlawful.

31.     At the time Defendants Petrick and Weinheimer, their deployment of KIPs was

directly authorized by Defendants Phelan, Porter, and Williams. As the Incident Commander,

Defendant Phelan authorized Defendants Petrick and Weinheimer to use KIPs against Mr.

Schlough. As the lieutenants in charge of supervising the area where Mr. Schlough was shot,

Defendants Porter, and Williams authorized Defendants Petrick and Weinheimer to use KIPs

against Mr. Schlough.

32.     Mr. Schlough helped the woman back away from the line of DPD officers and, as

he did so, the other individuals he had attended the protest with told him that his chin was falling

off. The KIP had left a gaping wound on his chin, and blood was pouring down onto the front of

his shirt. His friend put pressure on the wound and helped him clean it off.

33.     Mr. Schlough was shot with the KIP despite never having engaged in any activity

that could be considered violent. He was merely acting as a medic and attempting to help those

who were injured by police brutality during the protests. There was absolutely no justification for

using any force on Mr. Schlough, let alone blowing off his chin with a KIP.

34.     Mr. Schlough managed to walk to his house and his roommate helped transport

him to Swedish Medical Center. At the hospital, his chin looked like this:



*Gabriel Schlough's chin after being shot*

35.     Mr. Schlough received twenty-two stitches to close the wound on his chin. He also had significant bruising on his chest where he was shot with the second KIP. For two weeks after being shot by police, Mr. Schlough struggled to focus at work due to mental stress. He still experiences significant pain from this wound and will likely require plastic surgery for it to heal properly. He has taken many days off of work to manage the pain and stress, all because he was peacefully trying to serve as a medic and assist protesters who had been injured by police

**Denver's decision to not discipline any officer for the use of force against Mr. Schlough and ratify their conduct demonstrates that the use of force was in accordance with Denver's customs, policies, practices, and training.**

36.     Upon information and belief, consistent with Denver's longstanding pattern in response to officers who use excessive force against protesters, and particularly its officers use of force against protesters during the George Floyd protests, Denver did not impose *any* discipline against Defendants Petrick and Weinheimer for using excessive force against Plaintiff, or

Defendants Phelan, Porter, and Williams who authorized the use of excessive force against Plaintiff.

37.    Upon information and belief, Denver has provided no additional training to any officer related to the incident with Plaintiff.

38.    Through Denver's unlawful conduct of condoning the use of force against Plaintiff, Denver ratified the unconstitutional actions of its officers.

**DPD officers have a history if indiscriminately shooting crowds of peaceful protesters with KIPs.**

39.    On October 29, 2011, Denver police officers responded to a peaceful protest by indiscriminately shooting protesters with KIPs, including pepper balls. Denver police officers fired a number of these rounds at people who were lawfully dispersing. Not only did Denver police officers shoot KIPs, including pepper balls, indiscriminately into the crowd of peaceful protesters, but also they also routinely targeted individuals' faces. For example, Denver police officers shot Philip Becerra in the face with a pepper ball. Mr. Becerra suffered facial injuries on the bridge of his nose, less than an inch from his left eye. Mr. Becerra could have easily been blinded in that eye, or even killed, by this indiscriminate use of force.

40.    After the October 29, 2011 incident, the ACLU of Colorado sent a letter outlining the concerns associated with the use of indiscriminate force by DPD officers to Denver.

41.    Despite being notified of these grossly excessive uses of force and the widespread nature of it, upon information and belief, Denver did not provide further training to their officers or discipline any officer involved. Denver's ratification of this indiscriminate use of force by its officers signaled to DPD officers that such force was consistent with Denver's customs, policies, practices, and training, and that DPD officers can use such force without any risk of discipline.

**DPD officers used potentially deadly force against Mr. Schlough.**

42.     DPD officers used a number of KIPs against peaceful protesters, including Mr. Schlough, during the protests. These KIPs included foam bullets, beanbag rounds, pepper balls, and tear gas canisters.

43.     KIPs have a larger surface area than other ammunition, and thus they take unpredictable flight paths and reduced accuracy is inevitable.[1]

44.     It is extremely common for KIPs to cause contusions, abrasions, and hematomas.[2] Additionally, blunt impact may cause internal injuries.[3]

45.     Fatalities may occur when impact is at the head, neck, or precordium (the region of the chest immediately in front of the heart).[4]

46.     According to a systematic review of available literature, three percent of those injured by KIPs died from their injuries.[5] They permanently injured Fifteen percent of 1,984 people studied.[6]

47.     DPD uses 40mm launchers to shoot projectiles. 40mm launchers are firearms that shoot 40 mm specialty impact munitions at a speed of 90 to 100 miles per hour.

---

[1] Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.; *Kinetic Impact Projectiles*, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheet_Kinetic_Impact_Projectiles.pdf.
[2] W. Bozeman & J. Winslow, *Medical Aspects of Less Lethal Weapons*, The Internet Journal of Rescue and Disaster Medicine, https://print.ispub.com/api/0/ispub-article/7142.
[3] *Id.*
[4] *Id.*
[5] Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.
[6] *Id.*

48.     DPD officers used 40mm launchers to launch foam bullets, sometimes referred to as rubber bullets, at protesters. Foam bullets are solid, spherical, cylindrical projectiles typically used to incapacitate a person and are known to leave bruising and welts.

49.     A 40mm round shot at the head, whether a beanbag, foam bullet, baton round, or tear gas canister, is deadly force.

50.     DPD officers also shot pepper balls at peaceful protesters and bystanders. Pepper balls have an immediate and incapacitating effect that creates a burning sensation to any exposed skin.[7]

51.     In addition to the burning effect of the OC contained in the pepper balls, the balls themselves can cause serious injury—even death—because of the high velocity at which they are shot. The launcher can shoot six to twelve pepper bullets per second at speeds up to 350 feet per second, or more than 238 miles per hour.[8]

52.     The Boston Police Department suspended use of pepper balls in 2004 after a college student was killed when a pepper ball struck her in the eye.[9]

53.     University of California, Davis police shot a pepper ball at an unarmed student while trying to break up a block party and permanently damaged his eye in 2004.[10]

---

[7] Florida Gulf Coast University, Weapons & Equipment Research Institute, *Less Lethal Weapon Effectiveness, Use of Force, and Suspect & Officer Injuries: A Five-Year Analysis* (2008).
[8] 2019 Product Catalog, PepperBall, https://www.pepperball.com/wp-content/uploads/2019/01/PepperBall-2019-product-catalog.pdf.
[9] Jonathan Finer, *Boston Police Suspend Use of Pepper-Ball Guns*, Wash. Post, Oct. 24, 2004, https://www.washingtonpost.com/archive/politics/2004/10/24/boston-police-suspend-use-of-pepper-ball-guns/dd773f5d-1651-4c2a-8a82-b967d77958b5.
[10] Maura Dolan, *Court rules police may be liable for pepper ball injuries*, L.A. Times, July 12, 2012, https://www.latimes.com/local/la-xpm-2012-jul-12-la-me-uc-davis-pepper-20120712-story.html.

54.    Denver itself has been called on, and conducted an internal investigation on, whether to end the use of pepper balls after they were used in response to Occupy demonstrations in October of 2011.

55.    DPD officers also used tear gas on peaceful protesters. Tear gas is an umbrella term for aerosolized chemical agents.[11] The two most common types of tear gas are CS and OC.[12] CS gas (o-chlorobenzylidene malononitrile) is a chlorinated, organic chemical. OC is Oleoresin Capsicum, which is derived from chiles, and is the active ingredient in pepper spray.[13]

56.    Tear gas can be deployed in a grenade or canister that produces a cloud of chemicals.[14] It is indiscriminate in nature.[15] Tear gas can cause severe coughing, crying, mucus production, and can make it difficult to breathe. It can also cause vision to become blurry, and eyes to tear up, become inflamed, and feel like they are burning. It can cause skin to turn red, become blistery, and develop a rash or chemical burn. It also causes disorientation.

57.    Tear gas can also cause respiratory arrest, vomiting and allergic reactions, and it can permanently damage the eyes, cause asthma symptoms, and cause traumatic brain injury. It can also have adverse effects on pregnant people and fetuses.

58.    Tear gas chemicals are banned in warfare.

---

[11] Operations Manual, Denver Police Department, https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook/OM_Book.pdf.

[12] Will Stone & Carrie Feibel, *From 'Flash Bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'*, NPR, June 6, 2020, https://www.npr.org/sections/healthshots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-real-risks-of-riot-control-agents.

[13] *Id.*

[14] *Chemical Irritants*, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheets_Chemical_Irritants.pdf.

[15] *Id.*

59.     During the global COVID-19 pandemic, tear gas can cause people to cough and spread infectious droplets, putting people at higher risk of symptomatic or severe COVID-19.

60.     Since the protests began on May 28, 2020, at least 60 protesters nationwide sustained serious injuries from the use of "less-lethal" weapons by law enforcement, including "a broken jaw, traumatic brain injuries, and blindness."[16]

61.     DPD officers' use of these less-than-lethal projectiles against peaceful protesters was approved, condoned, and ratified by Defendants Denver, Pazen, Phelan, Porter, and Williams. DPD officers were given specific authorization to use these less-than-lethal munitions, including KIPs, on peaceful protesters by Defendants Denver, Pazen, Phelan, Porter, and Williams.

**DPD officers purposefully and customarily shot protesters, and those assumed to be protesters, in the head, neck, face, and chest with KIPs.**

62.     On May 28, 2020, Michael Acker, a young black college student, was peacefully protesting in a march from the Capitol building to I-25. There, he watched from the pedestrian bridge as other protesters marched onto I-25. DPD officers formed a police line on the west side of Platte Street near the pedestrian bridge. One protester overheard one officer say something to the effect of, "If anyone moves, light 'em up." At this point, without any warning whatsoever, DPD officers began shooting pepper balls at the protesters, including Mr. Acker. Mr. Acker put on a gas mask that someone had given him and ran to help a woman who was being brutally pelted with pepper balls from a range of approximately fifteen feet. He continued acting as a medic to other protesters suffering the effects of the chemical agents unleashed by DPD until the group began retreating and Mr. Acker followed. As he was retreating, Mr. Acker raised his fist in

---

[16] Kaiser Health News, *Fractured skulls, lost eyes: Police often break own rules using "rubber bullets"*, Denver Post, June 23, 2020, https://www.denverpost.com/2020/06/23/george-floyd-protests-rubber-bullet-injuries.

the air. Immediately, and with no warning, one DPD officer fired a KIP at Mr. Acker's head, striking him in his right eye. It shattered the glass eye piece in his gas mask. He feared he would lose his eye. Had he not been wearing a gas mask, he likely would have. He received 12 stitches to close wounds on his forehead, nose, and upper eyelid, and doctors had to remove pieces of glass and debris from his eye. Over a month after the injury, Mr. Acker continued to experience foggy vision, light sensitivity, inability to read, and difficulty tracking movement in his right eye.



*Mr. Acker moments after being shot in the eye.*

63.     On May 28, 2020, while he was covering the protests rally at the State Capitol. Hyoung Chang, a credentialed press photographer for *The Denver Post*, was struck two times by pepper-ball rounds fired by law enforcement personnel. One round cut Chang's arm. The other shattered his press badge that was hanging around his neck. Mr. Chang was quoted after the event as saying, "If it was one shot, I can say it was an accident. I'm very sure it was the same guy twice. I'm very sure he pointed at me.*"*



*Hyoung Chang's arm after being shot.*

64.     On May 29, 2020, DPD officers shot Gabriel Thorn in the head with a KIP. While at the protest, Mr. Thorn served at times as a medic. Mr. Thorn is a veteran who served in the Armed Forces. Mr. Thorn also wore a red cross on his helmet and backpack to indicate that he was a medic there to treat those injured. Several times while treating injured people, DPD officers targeted him and shot pepper balls. He observed a largely peaceful protest. He witnessed DPD officers utilize rubber bullets, tear gas, flash bang grenades, and pepper balls. The protesters were attacked indiscriminately with these ordinances and without regard for safety. Mr. Thorn also observed DPD officers aiming at bodies and heads when firing rubber bullets. Having served in the military and been trained to use rubber bullets, Mr. Thorn was struck that these officers had not been trained to use them correctly. His training in the military made clear that these bullets were to be aimed at the ground and never directly at people, even in war zones. During the protest, Mr. Thorn was struck with pepper balls, rubber bullets, and was

tear gassed multiple times. When Mr. Thorn was struck with rubber bullets, as with many others, he was struck in the head. Fortunately, he was wearing a helmet at that time. ⌞SEP⌟

65.    On May 29, 2020, officer shot Andy Sannier in the chest with a KIP without warning while in downtown Denver during the protests. Mr. Sannier was walking home downtown that evening, when he saw a Black man yelling at (but not threatening) officers. A white couple started arguing with the Black man who was yelling at the officers. Mr. Sannier stopped and recorded this with his cell phone from a comfortable distance. DPD officers opened fire on the people arguing, and, seeing that Mr. Sannier was filming, shot him in the chest with a pepper ball.

66.    On May 29, 2020, in the afternoon, DPD officers shot Megan Matthews in the head with a KIP while she was participating in a peaceful protest near the Capitol. When she was shot in the head, Ms. Matthews was standing alone and not engaged in any violence or property destruction. When hit with the KIP, she immediately blacked out. When she woke up, her face was covered in blood. A friend then carried Ms. Matthews to a grassy area near the State Capitol, where she was bandaged by a doctor and later loaded into an ambulance.



*Megan Matthews after being shot in the eye.*

67.    On May 29, 2020, at approximately 8:15 p.m., a credentialed cameraman for KMGH-TV/Channel 7, was struck four times by KIPs fired by DPD officers in the chest. An additional projectile paint ball hit the front lens of his conspicuous professional-grade video camera, which was at head level.



*What the camera looked like after being shot.*

68.    On May 31, 2020, DPD officers shot at Trevor Hughes face with KIPS without

warning. Mr. Hughes was photographing and recording the protests near Colfax and Emerson at

approximately 8:30pm. While recording, with the camera near his face, DPD officers shot Mr.

Hughes in the hand with a KIP. The shot broke and severed Mr. Hughes's right ring finger,

leaving it dangling. Mr. Hughes immediately left the protest and went to urgent care. Mr. Hughes

had to have his finger surgically repaired.

69.    On May 30, 2020, Jeremy Jojola, an on-air correspondent for KUSA-TV/9News was shot with a less-lethal projectile round while standing beside a professional cameraman from that station. The round struck Mr. Jojola's backpack.

70.    On May 30, 2020, Lindsay Fendt, a freelance reporter and photographer was standing in a group of press photographers when a law enforcement officer kicked a pepper gas canister directly into her face.



*Lindsay Fendt after having a tear gas canister kicked into her face.*

71.    On May 30, 2020, DPD officers shot Michael McDaniel in the head with KIPs

without warning. Mr. McDaniel attended the protest rally on Saturday afternoon to serve as a

medic to attend to those injured by the police. At one point, the Police excessively tear-

gassed a parking lot on the corner of Colfax and Lincoln. The tear gas was so thick, that it was

a cloud that could not be seen through. Mr. McDaniel saw a protester crawling out on his hands and knees. The protester was choking and could not breathe. Mr. McDaniel, with his back to the police, kneeled down to treat the protester, who was still on all fours. The police then proceeded to target and shoot Mr. McDaniel and the protester with pepper bullets. They shot Mr. McDaniel in the head with KIPs. Thankfully, Mr. McDaniel was wearing a helmet, so when the police aimed at his head, they did not cause any injury, other than the intense burning pain that Mr. McDaniel experienced as a result of the pepper balls.

72.    On May 30, 2020, DPD officers shot Elizabeth Epps in the face with a KIP without warning. Prior to the curfew, DPD officers shot Ms. Epps with rubber bullets during a peaceful protest in front of the Capitol, after tear gassing and pepper-spraying the crowd without warning. A rubber bullet hit her face, breaking the plastic medical-grade respirator mask she was wearing and wounding her face.



*Elizabeth Epps after being shot in the face.*

73.    On May 30, 2020, DPD officers shot Jax Feldmann in the eye with a KIP without warning. Mr. Feldmann wasn't protesting when a law enforcement officer riding on the back of a DPD truck fired a projectile at his face without warning and blinded him in one eye. Mr. Feldmann, a 21-year-old delivery driver with Denver's River Bear American Meats, was walking about 9:30 p.m. from his friend's apartment at Grant Street and Colfax Avenue to his car parked a block away on Sherman Street. It was the first night that Denver was under an 8 p.m. curfew due to ongoing protests of police brutality, but Feldmann was trying to get home. There were no large groups of protesters nearby when Mr. Feldmann was shot and no one near him yelled at or throw anything at the DPD officers on the truck, which was marked with the DPD logo. Mr. Feldmann didn't see what hit him, but that reached his hand up to his face and felt blood. His

friend called 911 and Mr. Feldmann was transported to Denver Health via ambulance. Alone in the hospital, Mr. Feldman was told by doctors that they would have to perform emergency surgery to save his eye and doctors performed that surgery, however, Mr. Feldmann will never regain his full vision. The surgeon who operated on Feldmann's eye told Mr. Feldmann's mother that the damage was consistent with a rubber bullet.



*Jax Feldmann after being shot in the eye.*

74.     On May 30, 2020, DPD officers shot former Major League Baseball star Dale Murphy's son in the eye with a KIP without warning. Mr. Murphy's son was peacefully protesting in downtown Denver. After being shot, he was taken to the emergency room.



*Mr. Murphy's son after being shot in the eye.*

75.    On May 30, 2020, DPD officers without warning shot Russell Strong in the head

with a KIP. Mr. Strong was protesting near Civic Center Park and carrying a sign that read "No

justice, No peace." Shortly after 6 p.m., Mr. Strong was hit in the face with a KIP. The force of

the KIP knocked him out. As a result of this use of force, Mr. Strong required several facial

reconstructive surgeries to repair broken bones around his eye and to realign the right side of his

jaw. Mr. Strong lost his right eye because of the use of force by DPD officers. When he was shot,

Mr. Strong was simply peacefully protesting and was not engaging in any violence or property destruction.

76.     On May 30, 2020, DPD officers without warning shot Mercii Thomas in the face with a KIP. Ms. Thomas joined the peaceful protests that had been happening in Denver since the video of the brutal police murder of George Floyd had been released a few days earlier. As Ms. Thomas was protesting, she looked around her and was horrified to see the police firing Kinetic Impact Projectiles (KIPs) at protesters who were lying on the ground. She began filming the police violence against peaceful protesters with her phone. As she did so, she observed other people who were recording with their phones being targeted with KIPs. It occurred to her that filming the police could be making her a target too. She began retreating south on Broadway with her hands up, walking backwards toward 14th Street. Suddenly, Ms. Thomas felt a massive blow to her forehead. Everything went black as she fell to the ground and lost consciousness. She had been hit with a KIP directly in the head. As she regained consciousness, she found herself being picked up and taken to a curb by medics. She lay on the ground bleeding profusely from her head while the medics worked on applying a tourniquet. Then she felt a sudden burst of pain on her lower backside and realized police had hit her again, this time with a pepper ball. Ms. Thomas was terrified, bleeding on the ground, and still police were targeting her with projectiles. She eventually received medical care for her injuries.

77.     On May 31, 2020, DPD officers without warning shot Zachary Packard in the head with a KIP. Mr. Packard arrived at the protests on streets surrounding the Capitol at about 8 p.m. DPD officers formed lines on two perpendicular streets and began closing in on the groups of protesters. Mr. Packard heard a message from a SWAT vehicle that "curfew was in effect." DPD officers then started firing tear gas. Mr. Packard attempted to kick one tear gas canister

away from the group of protesters near him. As he stepped off the sidewalk, Mr. Packard was hit

in the head with a projectile. He was immediately knocked unconscious. DPD officers did not

issue a warning before shooting Mr. Packard in the ear. Bystanders carried Mr. Packard from the

sidewalk over into a patch of grass. When he returned to consciousness, a friend took him to the

hospital. A CAT scan later revealed that Mr. Packard suffered a fractured skull and jaw, two

fractured discs, and bleeding in his brain. Mr. Packard remained at the hospital for about one

week.



*Zachary Packard after being shot in the head*

78.     On May 31, 2020, DPD officers shot Youssef Amghar in the head and chest with

KIPs without warning. Well before curfew, Mx. Amghar was with other peaceful protesters on

the corner of Colfax and Lincoln. Protesters were chanting, "Hands up, don't shoot," and holding

signs. Mx. Amghar was standing on the sidewalk. There was a line of DPD officers on Colfax.

Mx. Amghar stood there with their hands up. Someone else not near them in the crowd threw a

water bottle at the officers. The DPD officers immediately began shooting into the crowd with

pepper balls. They did this without warning or giving any orders. At first, the DPD officers shot

indiscriminately into the crowd, but after the crowd moved back, they began shooting directly at Mx. Amghar, even though they were standing still with their hands up. The DPD officers first shot them in the arms and legs, then in the chest, and then directly in the face, even though they continued standing still with their hands up. The DPD officers shot them approximately 14 times. The DPD officers did not give any orders before, during, or after this incident. No one told Mx. Amghar to move back or gave them any other orders. Mx. Amghar was so upset at the DPD officers' use of force on them that they began yelling words to the effect of, "I'm a goddamn U.S. Marine, what are you doing?" Then DPD officers began throwing tear gas canisters at their feet. After a couple minutes, Mx. Amghar walked away and took cover behind a tree.

79.    On May 31, 2020, Alex Burness of *The Denver Post*, was fired upon, without warning, by law enforcement and shot in the head and abdomen with KIPs. DPD officers fired at Mr. Burness just after he yelled out "PRESS." He sustained a contusion on his head and right abdomen.



*Alex Burness after being shot in the abdomen*

80.    On May 31, 2020, DPD officers shot Darian Tindall in the chest with KIPs without warning. Ms. Tindall was hit in the chest with a pepper ball while marching on Colfax Avenue. Her hands were up above her head when she was shot, and she didn't see the projectile coming or anticipate the intense pain. She was given no warning by DPD.

81.    On June 1, 2020, DPD officers shot Ambrose Cruz in the head and chest with KIPs without warning. As a photographer and freelance journalist, Mr. Cruz wanted to document the protests as well as the police response. Throughout the evening, he documented the protests and police action as a photojournalist. At about 8:00 p.m., he was with protesters in front of the

Capitol. The protesters were chanting and peaceful. There were over 100 people present. There was a line of DPD officers present on all sides of the protesters, surrounding them. Sometime after 9:00 p.m., DPD officers moved in and began rapidly shooting tear gas and foam bullets at the protesters. They did not give any warning or orders. Because the police had surrounded the protesters on all sides, it was difficult for protesters to escape. Mr. Cruz ran away from the gas. At approximately 13th Avenue, he saw a man in an electric wheelchair. The man was stuck and Cruz tried to give him a hand. However, the wheelchair was extremely heavy. Unfortunately, Cruz had to leave him there while he was being engulfed by tear gas. Mr. Cruz ran towards the library. Around 13th Avenue, the DPD officers were shooting at him and protesters with tear gas and pepper balls. There were a lot of people who were trying to leave to go home. There were approximately 35 people at that corner, and they were all younger protesters, including teenagers. Almost all of them were Black. One protestor was having a seizure. Mr. Cruz and others tried to help him. Some people tried to leave, but DPD officers cornered them and shot pepper balls at them. A white person went up to the DPD officers to ask if they could leave because people wanted to go home. The DPD officer said that they could go home, and so people started walking towards where the officer told them to go. That officer started firing on people and everyone started running. Mr. Cruz ran with other protesters to a building and garage at 13th Avenue and Lincoln. The DPD officers ran after them. The DPD officers were shooting them with pepper balls. They did not give any orders or warnings. Mr. Cruz and others ran down to the garage but discovered that armored vehicles blocked off both ends of the block and there was no exit. Cruz ran up the stairs, and as he looked up, a Defendant DPD Officer shot him in the face with pepper balls. The DPD officer hit him three times in the eye area and knocked his glasses off. A female DPD officer told him, "If you don't fucking get on the ground, I'm going to

fucking kill you," or words to that effect. Even though Cruz stopped and was on the ground, the other DPD officer continued firing pepper balls at him, including at the back of his head. The DPD officer who had been repeatedly firing pepper balls at Cruz at close range taunted him, saying things like, "What happened to you? It looks like your wife beat you. I'd say that was two days old, this must have happened another night." Mr. Cruz's eye was bleeding, swollen shut, and bruised. He could not open his eye. A month after the attack, he still has light sensitivity and other problems with his eyesight.

82.     On June 2, 2020, DPD officers shot Darrell Hampton in the face with KIPs without warning. Mr. Hampton was peacefully protesting, and filming DPD officers, on the sidewalk near the Capitol in the afternoon. A number of DPD officers were standing on the back of a DPD pickup truck, carrying pepper ball guns. As the truck was driving away, one officer decided to randomly shoot Mr. Hampton in the face with a pepper ball for no apparent reason. There was no violence or property destruction happening; Mr. Hampton was simply standing on the sidewalk filming the protest and the officers.

### DPD officers customarily used indiscriminate force against protesters, and those assumed to be protesters, without warning.

**May 28, 2020**

83.     DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on May 28, 2020.

84.     DPD officers also brutalized a group of protesters gathered near the intersection of 14th Avenue and Sherman Avenue. Protesters at this intersection encountered a line of DPD officers and stayed there about another hour, chanting, "Hands up, don't shoot," and "I can't breathe." Another group of protesters walked down 14th Avenue and joined this group of

protesters. There were approximately 200 people. The officers tear gassed the entire crowd, without provocation or warning.

85.     DPD officers also brutalized an entire group of protesters near the Capitol building at about 6:30 p.m. At that time, DPD officers started launching tear gas canisters into a crowd of protesters without warning. At least one young man was hit with a canister. As soon as DPD officers launched the tear gas, the officers hopped on the back of a patrol van and drove away. Around 8 p.m., DPD officers returned to the Capitol building and formed a line. They slowly began advancing toward the protesters at the Capitol building. Without provocation or warning, the DPD officers launched tear gas at the crowd. At about 8:30 p.m., a crowd of protesters that was pushed down a street near the Capitol by DPD officers was tear gassed without any warning. At about 9 p.m., the crowd at that time was mostly seated on the Capitol steps talking amongst themselves. Then, without any warning or order to disperse, DPD officers deployed tear gas toward, and into, the crowd.

86.     Later that same night, DPD officers indiscriminately shot peaceful protesters with KIPs, including pepper balls and foam bullets.

**May 29, 2020**

87.     DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on May 29, 2020. In the evening, protesters had gathered near the Capitol and were kneeling in front of police chanting "Hands up! Don't shoot!" DPD police cars drive through the group and released tear gas and shot KIPs from the vehicles at peaceful protesters.

88.     Around approximately 4 p.m., DPD officers began firing KIPs, including rubber bullets and pepper balls, into the crowd of peaceful protesters every few minutes. They also threw flash bang grenades indiscriminately into the crowd every couple of minutes, which made

deafening sounds. Protesters were not throwing any objects at officers or otherwise provoking

the police violence that was visited upon them. After about an hour, DPD officers formed a riot

line and crossed the street towards the protesters, shooting more pepper balls and rubber bullets.

When this did not disperse the crowd, DPD officers released tear gas.

89.    There was no warning about enforcement of the curfew (which was newly

implemented) before the curfew began. Instead, at 8:00 p.m., DPD officers came out of the

Capitol building and launched tear gas, flash bang grenades, and/or pepper spray at the protesters

indiscriminately and without warning or dispersal orders.

90.    Around 8 p.m., DPD officers also shot projectiles directly at the cellphone of one

protester who was using it to record and broadcast police violence to her thousands of social

media followers, shattering it. Shortly after police shot this protester's phone, they deployed tear

gas into the group of protesters without any warning or justification.

91.    At approximately 9 p.m., DPD officers set up a line of about ten canisters of tear

gas in front of the Capitol building and set them off. DPD officers did not issue a warning before

any of these weapons were used.

92.    Throughout the evening, DPD officers indiscriminately shot tear gas and KIPs at

the entire group of protesters anytime any single protester moved within approximately 15 feet of

the officers. DPD officers never gave any dispersal orders or warning before indiscriminately

shooting protesters with KIPs or tear gas throughout the evening.

93.    Officers shot tear gas and KIPs at peaceful protesters who were kneeling on many

occasions. Many of these protesters had their hands in the air and their shirts off. At many points,

when peaceful protesters were on the Capitol steps with their hands up, chanting "Hands up,

don't shoot," DPD officers fired flash bang grenades, tear gas, and KIPs into the crowd indiscriminately and without warning.

**May 30, 2020**

94.     DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on May 30, 2020. In the afternoon, DPD officers sprayed tear gas over a large area by the Capitol occupied by predominantly peaceful protesters, including children. In response to a solitary protester tossing a water bottle toward the police, DPD officers deployed tear gas without first issuing a warning. At about 3:30 p.m., DPD officers shot pepper balls at a man who was kneeling in front of the officers with his arms raised. Later, DPD officers shot more pepper balls as well as flash bang grenades at protesters. Other DPD officers pulled a boy's goggles and mask off of his face before spraying him in the face with pepper spray. At 4 p.m., the crowd attempted to march north toward a line of officers at the Civic Center transit station, and, in response, DPD officers deployed tear gas into the crowd without warning, sending them running for their lives. At the same time, DPD officers dressed in riot gear standing near a DPD surveillance truck shot canisters of tear gas into the crowd. DPD officers did not offer a warning before firing the tear gas. No protester was being violent in any way, or threatening property destruction.

95.     Later, at about 5:30 p.m., there was a large crowd gathered outside of the Capitol building. A number of the peaceful protesters were on their knees chanting "Hands up! Don't Shoot!" As soon as the crowd stood from a kneeling position, officers began shooting tear gas and KIPs at the crowd without giving any warning. Shortly thereafter, officers shot protesters with KIPs, including rubber bullets, again.

96.    At about 7 p.m., officers formed a single file line and encircled Civic Center Park, standing shoulder to shoulder. Some protesters threw near-empty plastic water bottles in the direction of the line of officers. Out of concern that the situation would escalate and to protect the people residing in a nearby homeless encampment, one protester began telling protesters to stop throwing items at police. He ushered protesters toward the sidewalk, to get them away from the line of officers, and he told officers that he only wanted to protest peacefully. As that protester was talking to other protesters, one officer got out of his place in line, pushed his way between two other officers in the line, and sprayed that protester directly in his face with pepper spray. The DPD officer did not give any warning before spraying the pepper spray in his face.

97.    At about 7:50 p.m., ten minutes before the 8 p.m. curfew that Denver had instituted for the first time that day, numerous protesters attempted to leave the Capitol area to head to their cars, but DPD officers had barricaded the exits, trapping them. Approximately five minutes later, while the peaceful protesters were still trapped and before the curfew began, officers sprayed tear gas into the crowd, again without warning or an order to disperse.

98.    At approximately 9 p.m., DPD officers started pushing protesters out of the Capitol building area. Officers began using teargas and shooting projectiles indiscriminately at the crowd, including at women and children. There was no provocation or threatening behavior by the crowd, and no warnings from the officers before they shot the projectiles. Later into curfew, DPD officers continued to use indiscriminate force without warning. This included pepper-spraying individuals who were standing on their own property and shooting individuals with KIPs who yelled, from their front porches, for the officers to leave the neighborhood.

99.    Throughout the night, after curfew, there were roving gangs of DPD officers in riot gear, hanging off of vans and pickups trucks, driving around shooting protesters with KIPs.

These officers were randomly, and indiscriminately, drive-by shooting citizens who were outside
in the areas near the Capitol, in the Capitol Hill neighborhood, and on and around Broadway.
There were no warnings given before these DPD officers shot KIPs and tear gas canisters at
protesters and bystanders alike.

**May 31, 2020**

100.    DPD D officers used indiscriminate and excessive force against protesters
gathered at the Capitol building on May 31, 2020. In the evening, while peaceful protesters were
chanting and marching on the streets surrounding the Capitol, and some protesters at the front of
the march were lying down in the street like George Floyd (but none were throwing items or
being violent), DPD officers gassed the protesters without warning. Later, at about 9:30 p.m., a
group of approximately 250 peaceful protesters were marching near the Capitol. Without
warning, four SWAT cars pulled in on both sides of the marching crowd, "kettling" them
between two side streets. The DPD officers in the SWAT vehicles released tear gas from both
directions without warning. Most protesters remained trapped in the cloud of gas.

101.    After curfew, DPD officers consistently trapped peaceful protesters in corners or
between lines of officers, so that they could pelt them indiscriminately with KIPs.

**June 1, 2020**

102.    DPD officers used indiscriminate and excessive force against protesters gathered
at the Capitol building on June 1, 2020. Throughout the day and into the night, the protest was
completely peaceful. At about 8:00 p.m., there were approximately 100 peaceful protesters in
front of the Capitol. DPD officers formed a line in front of the Capitol and began pushing the
peaceful crowd into the street and other officers surrounded the peaceful protesters on all sides.
Once the protesters were successfully kettled, DPD officers released tear gas without warning.

Because the police had surrounded the protesters on all sides, it was difficult for protesters to escape.

103.    Around midnight, dozens of DPD officers came out of the shadows at the Capitol building, and a group of protesters began chanting, "Why are you in riot gear, I don't see no riot here." Protesters lay down in the street with other people linking arms. There were also protesters demonstrating against the police in a line. DPD officers began marching onto the lawn. Without any warning or dispersal order or any words, the DPD officers began tear-gassing the demonstrators. DPD officers also used a noise cannon without warning.

104.    As a result, a number of individuals who were attending the protests as medics left the protest. The group of medics that fled encountered approximately 50 DPD officers at the intersection of Lincoln and Broadway. DPD officers surrounded the medics, pushed them into a corner and began dousing them with pepper spray. The medics in front were wearing gear clearly identifying them as medics.

**June 2, 2020**

105.    DPD officers used indiscriminate and excessive force against protesters gathered on June 2, 2020. That night, DPD officers again released tear gas into the crowd of protesters without warning and shot KIPs, including pepper balls, at protesters. DPD officers utilized the same tactics they had used the previous five nights.

**Federal Judge R. Brooke Jackson holds that Denver's, and the agencies acting on its behalf, actions violated the Constitution during the George Floyd protests.**

106.    On Thursday, June 4, four persons who participated in the Denver protests since they began sued Denver, alleging that DPD officers', and the officers under their control, use of "less-lethal" weapons violated the First and Fourth Amendments. After a hearing on the matter, United States District Court Judge R. Brooke Jackson of the United States District Court for the

District of Colorado issued a temporary restraining order restricting DPD, and jurisdictions controlled by DPD, from using "less-lethal" projectiles and chemical agents on peaceful protesters.

107.    In doing so, Judge Jackson noted that "people have an absolute right to demonstrate and protest the actions of governmental officials, including police officers. It is one of the many freedoms on which this country was built." In response to the evidence presented, Judge Jackson was unequivocal about the behavior of DPD officers toward protesters, calling it "disgusting."

108.    Judge Jackson went on to conclude that there was a "strong likelihood" that DPD officers had engaged in excessive force in violation of the Fourth Amendment. Judge Jackson made this determination based on video evidence that showed "police conduct at the demonstrations" where "the officers had ample time for reflection and were not dealing with dangerous conditions" yet still "attacked [protesters[ with rubber bullets, tear gas, etc.… solely on the basis of their presence at the demonstrations, their viewpoint, or their attempts to render treatment to injured protesters." Judge Jackson found it particularly problematic that "officers specifically aimed at heads and groins, causing broken facial bones and ruptured testicles." In the end, Judge Jackson found that DPD officers had targeted "peaceful demonstrators, journalists, and medics… with extreme tactics meant to suppress riots, not to suppress demonstrations."

109.    Judge Jackson also held that there was a "strong likelihood" that DPD officers had violated the First Amendment in their treatment of peaceful protesters. In doing so, he found that: (1) the protesters "were engaged in constitutionally protected activity through organized political protest"; (2) DPD officers' "use of excessive force likely caused injury sufficient to chill a person of ordinary firmness from continuing to engage in that political protest" because

"[o]fficers used physical weapons and chemical agents to prevent not just peaceful demonstration, but also the media's ability to document the demonstrations and plaintiffs' and third parties' ability to offer aid to demonstrators" resulted in "[p]eaceful demonstrators' legitimate and credible fear of police retaliation" that was "silencing their political speech—the very speech most highly valued under the First Amendment."

110. Judge Jackson also made it a point to note that although he did "not agree with those who have committed property damage during the protests, property damage is a small price to pay for constitutional rights—especially the constitutional right of the public to speak against widespread injustice. If a store's windows must be broken to prevent a protestor's facial bones from being broken or eye being permanently damaged, that is more than a fair trade. If a building must be graffiti-ed to prevent the suppression of free speech, that is a fair trade. The threat to physical safety and free speech outweighs the threat to property."

111. Ultimately, Judge Jackson issued a temporary restraining order **banning** DPD officers, and those under their command, from shooting KIPs in a way that targets the "head, pelvis, or back" and from shooting KIPs "indiscriminately into a crowd." Judge Jackson also ordered that DPD were **required** to issue an order to disperse prior to using any chemical agents and that that order had to be followed "with adequate time for the intended audience to comply" and allow for egress.

**The actions of the law enforcement officers during the protests were ordered by Denver's final policymakers.**

112. Upon information and belief, DPD officers were given authority by Denver's final policymakers, including Defendants Pazen, Phelan, Porter, and Williams, to use less-than-lethal weapons to shoot protesters without warning.

113.    Upon information and belief, DPD officers were given authority by Denver's final policymakers, including Defendants Pazen, Phelan, Porter, and Williams, to use less-than-lethal weapons to shoot protesters in the head, face, and chest.

**DPD officers continually violate official policy with no repercussions.**

114.    Denver's own use of force policy restricts the use of less lethal shotgun or 40mm projectiles to only situations where (1) it is necessary to "incapacitate a combative or physically resistive person whose conduct rises at least to the level of Active Aggression"; (2) "it is likely to prevent an officer or a third person from being seriously injured or killed" or (3) it is necessary to "incapacitate a suicidal person who cannot be safely controlled with other force options." The policy defines "Active Aggression" as "a threat or overt act of an assault, coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to any person is imminent."

115.    The use of force policy makes clear that "[u]nless deadly force is warranted, an officer shall not intentionally deploy the less lethal shotgun projectile or forty (40) mm projectile": (1) "To the head, eyes, throat, neck, breasts of a female, genitalia, or spinal column" or (2) "From a range of less than ten (10) feet with the less lethal shotgun, or less than five (5) feet with the forty (40) mm projectile."

116.    The use of force policy emphasizes that the purpose of the use of less lethal shotgun or 40mm projectiles "is to neutralize the person to the point they can be safely controlled and taken into custody." It goes on to say that the use of such force is only allowable "when other force options would be inappropriate or ineffective under the circumstances **and** it is reasonable and necessary in order to attempt to avoid having to use deadly force."

117.    DPD officer, and officers under their control, violated these policies with impunity during the protests, relegating the use of force policy to meaningless pieces of paper sitting on a dusty shelf. Upon information and belief, no officer has been disciplined for blatantly violating this policy.

118.    Defendants Denver, Pazen, Phelan, Porter, and Williams' continued failure to discipline, supervise, and/or reprimand its officers for their repeated violation of the use of force policy effectively communicated to DPD officers, and officers under their control, that such force was consistent with Denver's customs, policies, practices, and training.

119.    DPD officers, and officers under their control, continued flagrant violation of the use of force policy demonstrates that Defendants Denver, Pazen, Phelan, Porter, and Williams fail to train its officers on this policy and/or provides training that this policy does not need to be followed.

120.    The existence of the use of force policy demonstrates that Defendants Denver, Pazen, Phelan, Porter, and Williams were on notice that they needed policies in place to control the use of less than lethal weapons, but were deliberately indifferent to the actions of DPD officers, and officers under their control, who used less-than-lethal weapons in such a way as to constitute excessive force under the constitution.

**Denver's customs, policies, practices, training, and supervision caused the violation of Mr. Schlough's constitutional rights.**

121.    Additionally, DPD officers customary and ongoing use of the less than lethal weapons to target protesters for demonstrating, an improper purpose under the policy, demonstrates that Denver, Defendant Pazen, and Defendant Phelan failed to adequately train their officers that less-than-lethal weapons cannot be used for the purpose of discouraging First

Amendment activity, to punish those who engage in First Amendment activity, or to retaliate against those who engage in First Amendment activity.

122.    Denver final policymakers, including Defendants Pazen and Phelan, have received ample notice that DPD officers were using less-than-lethal force against protesters to control and suppress demonstrations in the absence of any imminent threat to safety, including 150 complaints about the DPD in one 72-hour period,[17] condemnation from City Council members,[18] and widely publicized videos and firsthand accounts circulated through the local, state, and international press.[19]

123.    Denver decision makers, including Defendants Pazen, Phelan, Porter, and Williams, have also received notice that the actions of DPD officers in Denver against protesters violated the policies and procedures for the use of force outlined in the DPD's own Operations Manual.

124.    Moreover, Defendants Denver, Pazen, Phelan, Porter, and Williams are responsible for the actions of any non-DPD officers whose services were utilized during the period in which protests were ongoing. By utilizing those services, Defendants Denver, Pazen,

---

[17] Jesse Paul, *Complaints about police response to Denver's George Floyd protests under investigation as demonstrations hit day 6*, Colo. Sun, June 2, 2020, https://coloradosun.com/2020/06/02/denver-police-response-protests-under-investigation/.

[18] Conrad Swanson, *Denver City Council members call for investigation into police use of force during George Floyd protests*, Denver Post, June 2, 2020, https://www.denverpost.com/2020/06/02/denver-city-council-investigate-police-force-protest/; Letter, Denver City Council, June 5, 2020, https://denver.cbslocal.com/wp-content/uploads/sites/15909806/2020/06/Denver-city-council-calls-for-review-of-DPD-use-of-force-policy.pdf.

[19] Lori Jane Gliha, *Police projectile fractures Denver protester's face; she says it was unprovoked*, KDVR, June 3, 2020, https://kdvr.com/news/local/police-projectile-fractures-denver-protesters-face-she-says-it-was-unprovoked; Alex Rose, *Local man needs eye removed after projectile hits his face during afternoon protest in Denver*, KDVR, June 3, 2020, https://kdvr.com/news/local/local-man-needs-his-eye-removed-after-projectile-hits-his-face-during-afternoon-protest-in-denver/?fbclid=IwAR2Q9RdYRmi3dp5GnuyOf6Tm6E-NoquhzKTvHSknBTmUKLuZ-17UIc4YJkA.

Phelan, Porter, and Williams were required to ensure that all officers complied with both protesters' constitutional rights and Denver's use-of-force policies.

125.    On May 29, 2020, after only the first day of protests, Denver final policymakers, including Defendants Pazen, Phelan, Porter, and Williams, publicly ratified DPD officers' use of less-than-lethal force for crowd control at protests without warning and DPD officers shooting less-than-lethal projectiles at protesters head, neck, and chest.[20] This ratification gave DPD officers notice that these actions were consistent with Denver custom, policy, and practice.

126.    Further, Denver provided little to no training to officers on crowd control and the use of KIPs. Denver allowed officers who had no training on the use of KIPs, particularly pepper ball guns and 40mm launchers, to use these weapons during the entirety of the protests. Denver provided no crowd control training to many officers who policed the protests outside of the training provided at the academy. A large number of officers told Denver's Independent Monitor that they had received inadequate training on crowd control.

127.    The violations of Plaintiff's constitutional rights are a direct result of and caused by Defendants Denver, Pazen, Phelan, Porter, and Williams' policy, practice, and custom of authorizing DPD officers to use less-than-lethal weapons to control and suppress protests. These violations are also a direct result Defendants Denver, Pazen, Phelan, Porter, and Williams' utilization of the services of law enforcement officers from other jurisdictions who were authorized to use less-than-lethal weapons to control and suppress protests.

---

[20] Ana Campbell, *Denver law enforcement agencies have a long history of violence. A use-of-force policy is supposed to help*, Denverite, https://denverite.com/2020/05/29/denver-law-enforcements-long-sordid-history-of-violence/; Ryan Osborne, *Denver mayor, police chief say officers showed "restraint" during George Floyd protest*, Denver Channel, May 29, 2020, https://www.thedenverchannel.com/news/local-news/denver-mayor-police-chief-say-officers-showed-restraint-during-george-floyd-protest.

**Defendants Pazen, Phelan, Porter, and Williams abjectly failed to supervise the officers on the ground during the protests.**

128.    Throughout the protests, Defendants Pazen, Phelan, Porter, and Williams failed to provide any meaningful supervision of the officers under their control.

129.    Defendants Pazen, Phelan, Porter, and Williams failed to require that officers document in any way what days, times, and locations they were working throughout the protests. The complete and utter lack of a police roster is a basic aspect of supervision that Defendants failed to engage in.

130.    Defendants Pazen, Phelan, Porter, and Williams failed to require that officers author use of force reports relating to each use of force during the entirety of the George Floyd protests. The only use of force reports were authored weeks after the protest. The complete and utter lack of a requirement that officers author use of force reports, which would then be reviewed by supervisors like Defendants Pazen, Phelan, Porter, and Williams, is a basic aspect of supervision that Defendants failed to engage in.

131.    Defendants Pazen, Phelan, Porter, and Williams failed to require that officers author reports relating to the use of chemical weapons during the entirety of the George Floyd protests. The only report outlining what chemical weapons were used during the protest was authored on June 9, 2020. The complete and utter lack of a requirement that officers author use of force reports is a basic aspect of supervision that Defendants failed to engage in.

132.    Defendants Pazen, Phelan, Porter, and Williams failed to track the munitions that were used by officers during the entirety of the George Floyd protests. The complete and utter lack tracking the munitions used during the protests is a basic aspect of supervision that Defendants failed to engage in.

133.     Defendants Pazen, Phelan, Porter, and Williams failed to require that officers turn on their body-worn cameras during the entirety of the George Floyd protests. The complete and utter lack of a requirement that officers utilize their body-worn cameras is a basic aspect of supervision that Defendants failed to engage in.

134.     Defendants Pazen, Phelan, Porter, and Williams have only disciplined a few individuals for their actions during the George Floyd protests, despite rampant evidence that officers used grossly excessive force, failed to provide dispersal warnings and orders before using force, arrested individuals simply because they were protesting, failed to activate their body-worn cameras, and failed to document their uses of force throughout the protests. This complete lack of any discipline imposed continuously indicated to officers that their actions were consistent with DPD custom, policy, and practice, and ensured that officers, like the Defendants who shot Mr. Schlough, could use force against protesters without consequence.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Violation — Freedom Of Speech And Assembly
### (Plaintiff against Defendants)

135.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

136.     Defendants, acted under color of state law, and within the course and scope of their employment, in their capacities as officers of the DPD at all times relevant to the allegations in this Complaint.

137.     Defendants are "persons" under 42 U.S.C. § 1983.

138.     Plaintiff was engaged in First Amendment-protected expression by gathering to protest police brutality.

139.    The actions of Defendants – specifically, the use of excessive force against peaceful protesters – can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

140.    Plaintiff's expression was on a matter of public concern and did not violate any law.

141.    Plaintiff's expression occurred at a traditional public forum.

142.    Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiff's expression.

143.    Defendants' actions were not a reasonable time, place, and manner restriction on speech.

144.    Defendants, collectively, failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

145.    At the time when Defendants stopped Plaintiff from speaking and gathering, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to gather, express himself, and speak freely. Any reasonable law enforcement officer knew or should have known of this clearly established right.

146.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

147.    Defendants stopped Plaintiff from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

148.    Defendant Denver has a custom, practice or policy of tolerating violations of the First Amendment of the United States Constitution.

149.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

150.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

151.    Defendants Denver failed to properly supervise and/or train its officers.

152.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

153.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

154.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Violation — Retaliation
### (Plaintiff against Defendants)

155.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

156.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

157.    Defendants are "persons" under 42 U.S.C. § 1983.

158.     Plaintiff was engaged in First Amendment-protected expression by gathering to protest police brutality.

159.     The actions of Defendants – specifically, the use of excessive force against peaceful protesters – can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

160.     Plaintiff's expression was on a matter of public concern and did not violate any law.

161.     Plaintiff's expression occurred at a traditional public forum.

162.     Defendants jointly and on their own accord responded to Plaintiff's First Amendment protected activity with retaliation, including but not limited to use of physical force, including KIPs and chemical agents.

163.     By unlawfully using force against Plaintiff, Defendants sought to punish Plaintiff for exercising his First Amendment rights, to silence him, and to deter him from gathering and speaking in the future. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such First Amendment protected activity.

164.     Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his First Amendment rights.

165.     At the time when Defendants retaliated against Plaintiff for exercising his First Amendment rights, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to be free from retaliation. Any reasonable law enforcement officer knew or should have known of this clearly established right.

166.     Defendants, collectively, failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

167.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

168.    Defendants stopped Plaintiff from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

169.    Defendant Denver has a custom, practice or policy of tolerating its officers' retaliatory violations of the First Amendment of the United States Constitution.

170.    Defendant Denver failed to properly supervise and/or train its officers.

171.    The actions of Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

172.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

173.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

174.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

175.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth Amendment Violation — Excessive Force
### (Plaintiff against Defendants)

176.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

177.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

178.    Defendants are "persons" under 42 U.S.C. § 1983.

179.    Plaintiff had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

180.    Defendants did not have, at any time, a legally valid basis to seize Plaintiff.

181.    Defendants unlawfully seized Plaintiff by means of excessive physical force, including the use of chemical agents and KIPs.

182.    Defendants had no warrant authorizing any seizure of Plaintiff.

183.    Each Defendant failed to intervene to prevent the other Defendants from violating Plaintiff's constitutional rights, and is thereby liable for such failure to intervene.

184.    Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

185.    Plaintiff had committed no crime (nor could any of the Defendants have reasonably believed they had committed any crime) that would legally justify arrest or detention, Plaintiff gave the officers no reason to fear for their safety, Plaintiff was obviously unarmed, and Plaintiff was not resisting arrest or fleeing.

186.    Defendants did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances presented.

187.    Defendants recklessly created the situation in which they used force.

188.    Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

189.    At the time when Defendants used excessive force against Plaintiff, Plaintiff had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure from unreasonable seizure through excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

190.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

191.    Defendant Denver has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

192.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

193.    Defendant Denver customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

194.    Defendants Denver failed to properly supervise and/or train its officers.

195.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described herein, Plaintiff suffered injuries, damages, and losses.

196.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

197.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation — Excessive Force**
**(Plaintiff against Defendants)**

198.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

199.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

200.    Defendants are "persons" under 42 U.S.C. § 1983.

201.    Plaintiff had a protected Fourteenth Amendment Substantive Due Process interest against being unreasonably harmed by the use of excessive force at the hands of law enforcement personnel.

202.    Defendants did not have, at any time, a legally valid basis to use force against Plaintiff.

203.    Defendants' use of force was extremely disproportionate.

204.    Defendants acted with malice and/or excessive zeal amounting to an abuse of power.

205.    Defendants acted for the purpose of causing harm unrelated and unnecessary to any relevant policing objective.

206.    Defendants' actions were arbitrary and/or conscience shocking in light of the circumstances confronting them.

207.    Defendants failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

208.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

209.    At the time when Defendants used excessive force against Plaintiff, Plaintiff had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to be secure from excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

210.    Defendant Denver has a custom, practice or policy of tolerating violations of the Fourteenth Amendment of the United States Constitution.

211.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

212.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

213.    Defendants Denver failed to properly supervise and/or train its officers.

214.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

215.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

216.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment Violation — Due Process
### (Plaintiff against Defendants)

217.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

218.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

219.     Defendants are "persons" under 42 U.S.C. § 1983.

220.     The orders issued by Defendants, and the authority on which those orders were based, were vague and not clearly defined.

221.     The orders issued by Defendants, and the authority on which those orders were based, offered no clear and measurable standard by which Plaintiff and others could act lawfully.

222.     Defendants lacked legal authority, through Denver municipal ordinance, state law, or otherwise, to order the dispersal of Plaintiff and, thereby, there were no explicit standards to govern the order of dispersal or limits on law enforcement's authority to order dispersal.

223.     Defendants failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

224.     The orders issued by Defendants, and the authority on which those orders were based, failed to provide people of ordinary intelligence a reasonable opportunity to understand

what conduct they prohibited, and authorized or encouraged arbitrary and discriminatory

enforcement, or both.

225.    At the time when Defendants violated Plaintiff's due process rights, Plaintiff had

a clearly established constitutional right under the Fourteenth Amendment to the United States

Constitution to be afforded due process of law. Any reasonable law enforcement officer knew or

should have known of this clearly established right.

226.    Defendants engaged in these actions intentionally, willfully, and wantonly,

demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally

protected rights.

227.    Defendant Denver has a custom, practice or policy of tolerating violations of the

Fourteenth Amendment of the United States Constitution.

228.    The actions of the Defendants were authorized (before and during the fact), and

ratified (after the fact), by final policymakers for Defendant Denver.

229.    Defendant Denver customs, policies, and/or practices, and the decisions of its

final policymakers, were the moving force behind Defendants' violation of Plaintiff's

constitutional rights.

230.    Defendant Denver failed to properly supervise and/or train its officers.

231.    Defendants' intentional actions or inactions as described herein intentionally

deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by

the Constitution of the United States of America.

232.    Defendants' herein described acts or omissions were the moving force and the

legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to

non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff

suffered during and after the protest, and other compensatory and special damages.

233.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against each Defendant, and award him all relief allowed by law, including but not limited to the following:

A.    All appropriate relief at law and equity, including injunctive relief;

B.    Declaratory relief and other appropriate equitable relief;

C.    Economic losses on all claims as allowed by law;

D.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

E.    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

F.    Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

G.    Pre-and post-judgment interest at the lawful rate; and

H.    Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 7th day of February 2022.

KILLMER, LANE & NEWMAN, LLP

/s/ Andy McNulty
Andy McNulty
1543 Champa St., Ste. 400
Denver, CO 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
amcnulty@kln-law.com

ATTORNEY FOR PLAINTIFF